**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| Plaintiff, | Criminal No. 10-0366-2 |
| v. | OPINION |
| **DANNY BANNOUT,** | |
| Defendant. | |

**SALAS DISTRICT JUDGE**

Before the Court is defendant Danny Bannout's "emergency motion for compassionate release" pursuant to 18 U.S.C. § 3582(c)(1)(A) ("Motion"). (D.E. No. 205 ("Def. Mov. Br.")). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Crim. P. 43(b)(4); *United States v. Styer*, 573 F.3d 151, 154 (3d Cir. 2009). For the following reasons, the Court DENIES the Motion.

**I.     Background**

On August 12, 2010, Bannout pleaded guilty to conspiracy to obstruct interstate commerce by armed robbery in violation of 18 U.S.C. § 1951(a) and conspiracy to transport stolen goods in interstate commerce, in violation of 18 U.S.C. § 2314. (D.E. Nos. 83 & 84). Based on a total offense level of 34 and criminal history category of II, the applicable guideline range was 168 to 210 months' imprisonment. (D.E. No. 178, Sentencing Hearing Transcript ("Sentencing Tr.") at 12:14–13:1.) After considering the relevant factors in 18 U.S.C. § 3553(a), submissions by counsel, the PSR, and arguments made at the sentencing hearing, the Court sentenced Bannout to 190 months of imprisonment and 3 years of supervised release. (D.E. No. 154, Final Judgement,

at 2–3). Bannout is currently incarcerated at the Federal Correctional Institution, Danbury ("FCI Danbury"). His projected release date is October 21, 2024. (Def. Mov. Br., Exhibit C at 4).

Bannout now moves for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), arguing that the COVID-19 pandemic and his medical conditions—namely, obesity, reflux esophagitis and gastro esophageal reflux disease without esophagitis, blood in his stool, chronic back pain, and hyperlipidemia—create extraordinary and compelling reasons to release him from imprisonment and to place him in home confinement with his wife and daughter. (*See generally* Def. Mov. Br.). Pursuant to the Court's Order, the Government submitted opposition to the Motion on November 2, 2020. (D.E. No. 213 ("Gov. Opp. Br.")).

## II.   Legal Standards

Once a term of imprisonment has been imposed, the Court may only modify it under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). Relevant here, 18 U.S.C. § 3582(c)(1) provides that, in any case:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that-
>
> > (i) extraordinary and compelling reasons warrant such a reduction;
> >
> > [. . .]
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

The United States Sentencing Commission has promulgated a policy statement that, in relevant

part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community, as provided in 18 U.S.C. § 3142(g); and (iii) release from custody complies with the Section 3553(a) factors. *See* U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018)).

### III. Analysis

As an initial matter, the Government does not dispute that Bannout has satisfied the exhaustion requirement. (*See* Gov. Opp. Br. at 6). The Government acknowledges that Bannout filed his request for compassionate release with the BOP on May 5, 2020, which the BOP denied on May 7, 2020. (*Id.*) While the Government states that it is unaware of an administrative appeal filed by Bannout (*id.*), Bannout is not required to completely exhaust the administrative remedy process before he can move this Court. *See United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (holding that the defendant may file the motion to the Court "thirty days after the warden receives his request"). Because more than thirty days have passed since Bannout filed his request with the BOP, the Court agrees that the Motion is properly before the Court for consideration pursuant to § 3582(c)(1)(A). *See id.*

#### A. Extraordinary and Compelling Reasons for Reduction

Per Congressional directive, the Sentencing Commission issued a policy statement that extraordinary and compelling reasons for compassionate release exist when the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, Application Note 1(A)(ii)(I). In addition, the policy statement includes a catchall provision that allows the Director of the BOP to

determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the enumerated reasons described in the policy statement. *Id.* at Application Note 1(D). Because the Sentencing Commission's policy statement was issued before Section 3582(c) was amended to allow defendants to file motions for compassionate release, the policy statement refers only to motions filed by the Director of BOP. *See generally* U.S.S.G. § 1B1.13. Notwithstanding, the parties do not dispute that the policy statement applies where, as here, the motion for compassionate release was filed by the prisoner. (*See* Def. Mov. Br. at 4–5; Gov. Opp. Br. at 27 n.8).

The Government agrees that Bannout presents "at least one 'extraordinary and compelling reason' that may allow courts to reduce a defendant's sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)." (Gov. Opp. Br. at 8). Specifically, the Government acknowledges that Bannout is "in a high risk category, as defined by the CDC" because of his BMI of approximately 34.2 kg/m.$^2$ (*Id.*). Nevertheless, the Government extensively argues that the preventive measures at FCI Danbury sufficiently mitigate Bannout's increased risks associated with his obesity and the COVID-19 pandemic. (*See* Gov. Opp. Br. at 13–26 & 30–32).

The Government's position is somewhat ambiguous. Generally, whether FCI Danbury adequately addresses Bannout's medical needs and sufficiently mitigates the impact of the COVID-19 virus are factors courts consistently consider when analyzing whether "extraordinary and compelling" reasons exist to justify a reduction of sentence. *See, e.g.*, *United States v. Bernard*, No. 14-710, 2020 WL 6689798, at *5 (D.N.J. Nov. 12, 2020) (considering the preventative measures implemented and the number of positive cases identified in the BOP facility at issue when analyzing whether compelling and extraordinary reasons exist for release); *United States v. Graham*, No. 06-0478, 2020 WL 6391177, at *2 (D.N.J. Nov. 2, 2020) (same); *United*

4

*States v. Mayfield*, No. 07-801, 2020 WL 2744607, at *3 (D.N.J. May 27, 2020) (same); *United States v. Pizarror*, No. 18-44-1, 2020 WL 6582631, at *2 (E.D. Pa. Nov. 10, 2020). In other words, an inmate's medical condition is usually only part of the consideration in conducting the extraordinary and compelling analysis vis-à-vis COVID-19. Other considerations include the steps taken by the facility to prevent the spread of the virus and the facility's success in doing so. Similarly, a pertinent consideration is whether an inmate is requesting release to an area with a high number of cases. Yet, here the Government's argument regarding the sufficiency of FCI Danbury's preventative measures appears moot because it concedes that "at least one 'extraordinary and compelling reason'" exists to justify a reduction to Bannout's sentence. (Gov. Opp. Br. at 8). As a result, the Court assumes that Bannout has proved an extraordinary and compelling reason to justify his reduction in sentence in light of his obesity.

Nevertheless, even if Bannout's medical conditions and the COVID-19 pandemic create extraordinary and compelling reasons that justify release, the Court's analysis does not end there. The Court may not modify Bannout's term of imprisonment unless it also considers the "factors set forth in Section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1).

**B.     Section 3553(a) Factors and Dangerousness**

The applicable Section 3553(a) factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

These factors are examined in the context of the requirement that the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." 18 U.S.C. § 3553(a).

As summarized in the pre-sentencing report ("PSR"), Bannout has a long criminal record. From 1994 to 2004, Bannout was involved in the manufacture and distribution of counterfeit goods. (PSR ¶¶ 281–283). In 2005, Bannout was arrested for distribution of ecstasy. (*Id.* ¶¶ 274–278). Thereafter, he was convicted for conspiracy to distribute ecstasy and trafficking in counterfeit goods, for which he was sentenced to 87 months of imprisonment and three years of supervised release. (*Id.* ¶ 273). Bannout was nevertheless granted bail in 2005, ▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (*Id.* ¶ 308, *see* Gov. Opp. Br. at 4). While he was on bail ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, from 2009 to 2010, Bannout participated in two robberies and a burglary. Specifically, on February 9, 2010, Bannout and his co-defendants robbed a designer perfume warehouse in Carlstadt, New Jersey. (PSR ¶ 39). The team worked as two crews, where the raid crew, consisting of then-current and former NYPD officers, robbed the warehouse under the pretense of a police raid, and where Bannout's crew were responsible for loading and transporting merchandise. (*Id.* ¶ 40, *see id.* ¶¶ 41–56). The investigation of the Carlstadt robbery revealed that, on December 30, 2009, Bannout and a subset of his co-defendants also stole, transported, and sold goods from a storage facility in North Brunswick, New Jersey. (*Id.* ¶¶ 68–73). It was further discovered that, in the summer of 2009, Bannout and his co-defendants also robbed another warehouse in Brooklyn, New York, in the

same manner as the Carlstadt robbery and under the pretense of a police raid. (*Id.* ¶¶ 92–102).[1] Finally, Bannout operated an illegal poker parlor with his brother. (*Id.* ¶ 26). The PSR calculated a total offense level of 36 and a criminal history category of II, for which the Guideline range for imprisonment was 210 to 262 months. (*Id.* ¶316).

At Bannout's sentencing hearing, the Court reduced the total offense level to 34, based on the finding that no victim suffered from bodily injuries pursuant to U.S.S.G. § 2B3.1(b)(3)(A). (*See* Sentencing Tr. at 2:23–3:9). The resulting Guideline range, for a total offense level of 34 and a criminal history category of II, was 168 to 210 months. (*Id.* at 12:14–13:1). The sentencing court specifically found that Bannout qualified as a leader or organizer in the conspiracy, because he "originated the idea," "planned the execution of the job," and "went out and got the people to help." (*Id.* 12:3–13, 33:13–34:2). The Court further rejected the defense's argument that just because a long sentence was imposed, "therefore it [was] Draconian." (*Id.* at 23:24–24:10). Instead, recognizing the "seriousness of the crimes with which [Bannout] willingly participated," and considering the "need to give [Bannount] a chance to rehabilitate himself", as well as factors such as the consistency required in sentencing Bannout and his co-defendants, and Bannout's dependents and family life, the sentencing court found that a 190-month sentence is "a just, appropriate sentence." (*Id.* at 26: 7–27: 3, 33:13–36:4).

Considering the § 3553(a) factors for this Motion, the Court is not persuaded that compassionate release should be granted. As of May 20, 2020, Bannout has served 110 months, or 66% of his expected term, taking into account the good time credit she received. (Def. Mov. Br. at 2 n.2). His release date to home confinement is April 21, 2024 and his projected release date is October 21, 2024. (*Id.* at 2). Granting Bannout's release from BOP custody is to all intents

---

[1] The warehouse in Brooklyn, New York was operated by individuals dealt in counterfeit designer goods. (PSR ¶ 28). As a result, the robbery was never reported nor was Bannout charged for it. (*Id.* at 63).

and purposes a sentence reduction. The Court cannot ignore the seriousness of Bannout's crimes, the leadership role he played, and his extensive criminal history. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Not only does Bannout have a history of recidivating, his past conduct indicates that a sentence of 110 months would be insufficient to promote respect for the law or to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2). The Court has considered Bannout's evidence as to his post-sentencing efforts at rehabilitation. Those efforts include obtaining a GED and taking various self-improvement, language, and vocational skill courses. (Def. Mov. Br. at 16; *see also* Def. Mov. Br. Ex. C at 8). The Court also notes that, with one minor exception, Bannout has been free from any disciplinary infractions. (Def. Mov. Br. at 15; *see also* Def. Mov. Br. Ex. C at 7). However, those efforts do not materially change the Court's Section 3553(a) analysis in light of Bannout's extensive criminal history.

In short, even if Bannout has demonstrated increased risk because of his medical conditions and the ongoing pandemic, the analysis under Section 3553 (a) and U.S.S.G. § 1B1.13 set forth above constrains the Court to deny his relief under 18 U.S.C. § 3582(c)(1)(A).

**IV. Conclusion**

For the foregoing reasons, Bannout's Motion is DENIED. An appropriate Order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**